# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>　　　Plaintiff,<br>vs.<br>(1) Leeann Louise Mikels,<br>　　　Defendant. | CR 10-1589-TUC-FRZ (JCG)<br>**REPORT &<br>RECOMMENDATION** |

Pending before the Court is a Motion to Suppress Statements filed by Defendant Leeann Louis Mikels on August 4, 2010. (Doc. 11.)  The United States filed a Response to the Motion on September 24, 2010.  (Doc. 22.)

This matter came before the Court for a report and recommendation as a result of a referral made on June 11, 2010, pursuant to LRCrim 5.1. (Doc. No. 4.)  This matter was set for evidentiary hearing and evidence was heard on October 19, 2010.  (Doc. 23.)  Defendant was present and represented by counsel.  This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement.

Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, grant Defendant's Motion to Suppress Statements.

**FACTUAL FINDINGS**

The stop at issue in this motion occurred on June 7, 2010. On that day, United States Border Patrol Agent Francisco Ramirez stopped Defendant Leeann Mikels on State Route 286 near Sasabe, Arizona.

As of June 7, 2010, Agent Ramirez had been assigned full-time patrol duties for approximately nine months. He joined the Border Patrol on November 3, 2008. In April 2009, following his graduation from the Border Patrol Academy in Artesia, New Mexico, he began field duties and was assigned to work in the Tucson Sector in Tucson, Arizona. For one month, he received field training, which involved riding with a field training officer who demonstrated the areas of responsibility. For the next two months, he rode with another agent one-on-one. Agent Ramirez had been assigned to work the areas of Sasabe to Arivaca, and Amado and its surrounding areas. These two areas include all of State Route 86 east and the west side of State Route 286, north and south of Arivaca East and West, and North of the State Route 86 checkpoint, Avra Valley area. Agent Ramirez assumed full patrol duties around September 2009.

Agent Ramirez has worked the checkpoint located at milepost 22 on Arivaca East and one located at milepost 25 on State Route 286. Agent Ramirez testified that he is familiar with the routes that are used to circumvent the checkpoints. Agent Ramirez is also familiar with the Sasabe area and the residents and people who live and work there. At the hearing, Agent Ramirez identified the businesses and ranches in the Sasabe area and their location, in many cases by specific milepost. Sasabe has approximately fifty residents and is a half mile away from the international border. Local traffic consists of ranch owners, the people who work at the Port of Entry, and people who are going into Sasabe to cross into Mexico. Most of the residents drive pickup trucks; those who work at the Port typically drive cars.

On June 7, 2010, Agent Ramirez was assigned to work the position called Sasabe Central or Sasabe Sheriff. It is a location approximately .7 to 1 mile north of the Port of Entry in Sasabe, on the east side of State Route 286. State Route 286 is a two-lane paved

1  road that leads from the international border through Sasabe, north to State Route 86. State
2  Route 86 east leads to Tucson. There are side roads leading off of State Route 286, including
3  Arivaca Road at milepost 12. The only town along State Route 286 is Sasabe. There is a
4  checkpoint on State Route 286 north of Arivaca Road and just north of milepost 25, known
5  as the Sasabe Central position. The duties of the Sasabe Central position are to observe
6  southbound and northbound traffic on State Route 286 and watch over the town of Sasabe
7  because there is no other law enforcement presence there. Agent Ramirez has worked the
8  Sasabe Central position ten or more times a month since September of 2009.

9  There are four different shifts assigned to work that particular location: 11:00 pm to
10 7:00 a.m.; 5:00 a.m. to 1:00 p.m.; 11:00 a.m. to 7:00 p.m.; and 5:00 p.m. to 1:00 a.m. The
11 shift starts at the Tucson Sector station in Tucson with a daily briefing. From the assigned
12 starting shift time, it takes approximately one and a half hours to two hours to get to the
13 assigned duty area in Sasabe. An agent will almost always wait for the agent on the next
14 shift to be in close proximity before leaving his position at the end of his shift. Agent
15 Ramirez testified there is a rise in illegal traffic during shift changes. He based this
16 conclusion on his own experience, information from other agents, and "intel" from the
17 station. He is aware that the Sasabe Central position is scouted from across the border. In
18 fact, Agent Ramirez has personally seen persons with binoculars looking at the agents on the
19 United States' side. On June 7, 2010, Agent Ramirez was scheduled to end his shift at 7:00
20 p.m., which meant he expected to be leaving his position around 6:45 or 7:00.

21 At approximately 6:30 p.m., Agent Ramirez was parked at the Sasabe Central
22 position, about 15-20 feet off the side of the road, with his vehicle clearly visible, when he
23 observed a white older model Ford F150 pick up truck. Although he could discern that the
24 driver was a female and the passenger a male, he could not observe the occupants' personal
25 characteristics, such as ethnicity or race. The truck caught his attention because usually
26 when people pass by they wave or look at him. The driver of the truck was staring straight
27 ahead and appeared to be nervously gripping the steering wheel very hard with her hands in
28 a 10-2 position. Although he was not able to tell the amount of pressure she was putting on

1 the wheel, Agent Ramirez testified that she appeared tense. Agent Ramirez also testified that
2 although a driver is supposed to face forward with both hands on the steering wheel, for the
3 most part people in that area don't really do that.

4 As the truck passed, he also noticed that the truck was a recently registered vehicle,
5 but was an older model truck. This caused him suspicion because smuggling organizations
6 are known to use older or less desirable vehicles because if their loads are compromised, the
7 seizure of an older model vehicle will not be a great loss. In addition, Agent Ramirez found
8 the plate suspicious because most of the vehicles in that area had older plates.

9 Agent Ramirez pulled out to follow the truck. He requested a registration check on
10 the vehicle from the dispatcher and was informed that the vehicle was registered out of Sells,
11 Arizona, and that it had not crossed the border within the previous 72 hours. Agent Ramirez
12 thought it was unusual that a vehicle from Sells would be in Sasabe without crossing the
13 border because Sells is relatively far away on State Route 86 to the west and there is not
14 much going on in Sasabe that would be a draw. At that point, Agent Ramirez "decided to
15 initiate a vehicle stop due to immigration privileges."

16 The stop occurred around milepost 8.5 on State Route 286 northbound. Agent
17 Ramirez had no difficulty in pulling over the truck. The driver, later identified as Leeann
18 Mikels, pulled to the side of the road. Neither the driver nor the passenger did anything
19 unusual during this time.

20 On cross-examination, Agent Ramirez agreed that in pulling over Mikels, he intended
21 to conduct an extended border search. Prior to the stop, he had no suspicion that the
22 occupants of the vehicle were illegal. He did not see anything that appeared to be
23 contraband. He agreed that his only reason for the stop was for an immigration check.

24 Although Agent Ramirez could tell that the truck's license plate was newly issued by
25 the arrangement of the letters and numbers (three letters followed by four numbers on the
26 new plates; three letters followed by three numbers on the old), he did not know when
27 Arizona first added the additional symbol and he did not know the date of registration of the
28 truck when he stopped it. At the time the truck was pulled over, the pickup truck had not

done anything to circumvent the upcoming immigration checkpoint at milepost 25. There was no evidence that Mikels was violating any traffic laws before the stop.

Defendant Mikels testified that on June 7, 2010, she and her brother-in-law, Jayson Magrum, stopped at a gas station in Sasabe, Arizona, and bought gas and food before driving north on State Route 286. She passed two parked Border Patrol vehicles in Sasabe, one facing east and one facing west. She looked straight at them and continued to drive. When she wasn't eating, she had both hands on the steering wheel "because it's a big truck." One of the Border Patrol vehicles - a truck - followed her, and after approximately five minutes, pulled her over.

Mikels testified that the agent who pulled her over was not Agent Ramirez. According to Mikels, Ramirez arrived on the scene approximately five or ten minutes after her vehicle was stopped.[1]

The Defendant proferred that passenger Magrum's testimony would be consistent with Mikels'.[2] The government accepted the proffer.

On July 7, 2010, Defendant was changed with possession with intent to distribute 112 kilograms of marijuana based on the marijuana found in the defendant's truck after it was stopped on June 7, 2010. (Doc. 8.)

## ANALYSIS

Defendant contends that Border Patrol agents stopped the Defendant's vehicle without reasonable suspicion, in violation of her Fourth Amendment rights.[3]

---

[1] It appears to the Magistrate that Defendant Mikels may have confused the agent who stopped her with agents who later arrived at the scene. Regardless, Agent Ramirez credibly testified that he initiated the stop of Mikels' vehicle and his reasons for doing so. The Magistrate therefore credits his testimony.

[2] Defendant proferred Magrum's testimony after Magrum was directed to the Federal Public Defenders for possible representation.

[3] Although Agent Ramirez testified that he stopped the Defendant's vehicle to conduct an immigration inspection or extended border search, the government did not rely on that basis in support of the stop. As the government argued solely on the existence of reasonable suspicion, that is the only theory addressed in this report.

- 5 -

1    The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. *See Terry v. Ohio*, 392 U.S. 1, 9 (1968). A stop is justified under the Fourth Amendment if the officer's action is supported by reasonable suspicion to believe that the person stopped is, or is about to be, engaged in criminal activity. *See United States v. Arvizu,* 534 U.S. 266, 273 (2002). A car passenger may be stopped, as well, where there is reasonable suspicion to stop the vehicle. *See U.S. v. Hensley*, 469 U.S. 221, 235–236 (1985).

   In making a reasonable suspicion determination, the Court looks to the totality of the circumstances to evaluate whether the detaining officers have a "particularized and objective basis" for suspecting legal wrongdoing. *Arvizu,* 534 U.S. at 273. Officers' reasonable suspicion may be informed by the officers' own experience and specialized training; officers may make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." *Id.* "Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area." *See United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). "Officers may consider the characteristics of the area in which they encounter a vehicle. Its proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic are all relevant." *Id.* at 884-885 (citations omitted). They also may consider information about recent illegal border crossings in the area. *Id.* at 885. "The driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion." *Id.* (citations omitted). "Aspects of the vehicle itself may justify suspicion." *Id.* Although previous criminal activity cannot establish reasonable suspicion by itself, law enforcement officers may consider a criminal past as part of the total calculus. *Burrell v. McIlroy*, 464 F.3d 853, 858, nt. 3 (9th Cir. 2006). In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling. *Brignoni-Ponce*, 422 U.S. at 884-85 (citing *Terry*, 392 U.S. at 27).

1 Agent Ramirez's decision to stop Defendant's vehicle was based on factors too 2 common to support a finding of reasonable suspicion of criminal activity. *United States v.* 3 *Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (reasonable suspicion cannot rely 4 solely on generalizations that, if accepted, cast suspicion on large segments or entire 5 categories of the law abiding population). Agent Ramirez testified that he stopped Defendant 6 Mikels' vehicle because (1) the driver's hands were firm on the steering wheel in a 10 - 2 7 position and she was looking straight ahead; (2) the vehicle was an older model truck and had 8 a newly issued Arizona license plate; (3) the vehicle was not local in that it was registered 9 in Sells, Arizona; and (4) the vehicle was traveling around a shift change. Of these factors, 10 most are not particularly related to criminal activity. Although Defendant's vehicle had a 11 newly-issued license plate, all vehicles have a newly-issued license plate at some time; it is 12 not a characteristic unique to drug-smuggling vehicles. Moreover, Defendant's pickup truck 13 was the type of vehicle which Agent Ramirez acknowledges was commonly present in the 14 Sasabe area. Similarly, it would not be uncommon for motorists to be driving in the area 15 during a Border Patrol shift change at the Sasabe Central position, particularly since shift 16 changes occur four times a day. Although the driver stared straight ahead and, according to 17 Agent Ramirez, did not look at him, little weight has been given to such reactions. *See* 18 *Hernandez-Alvarado*, 891 F.2d at 1418-19 (9th Cir. 1989). The fact that a vehicle is 19 registered in Sells, several miles away, and its reason for being in Sasabe was unknown, may 20 or may not suggest that criminal activity is afoot. No testimony was presented that State 21 Route 286 is a known as a smuggling route; however, given its proximity to the border, this 22 may be an accepted premise. Nonetheless, it must be considered in combination with other 23 factors supporting a finding of reasonable suspicion. *See Sigmond-Ballesteros*, 285 F.3d at 24 1124 (a route has minimal significance when substantially all of the traffic on the road is 25 lawful). In addition, Defendant was traveling at the speed limit, complying with all traffic 26 laws, her origin was unknown except for the fact that her vehicle had not crossed the border, 27 and Agent Ramirez observed nothing to indicate that the vehicle was carrying contraband ,
28

1 that its occupants lacked documentation, or that the vehicle was attempting to avoid the
2 checkpoint. These are all factors which weigh against a finding of reasonable suspicion.

3       The Magistrate does not question Agent Ramirez's credibility with respect to his stated
4 reasons for stopping Defendant Mikels' vehicle. Agent Ramirez sincerely testified as to his
5 reasons for his decision to stop. However, those factors, considered in their totality, are
6 insufficient under the binding precedent to establish reasonable suspicion. The stop at issue
7 in this case is similar to stops in other cases in which courts have concluded that reasonable
8 suspicion did not exist. *See United States v. Jimenez-Medina*, 173 F.3d 752 (9th Cir. 1999)
9 (the type of vehicle, the slow speed of the vehicle, the driver's preoccupation, the vehicle
10 registration, Interstate 10's reputation as a corridor for alien smuggling, and the time of
11 evening insufficient factors to justify investigatory stop); *United States v. Rodriguez*, 976
12 F.2d 592 (9th Cir. 1992) (no reasonable suspicion for stop where vehicle was traveling a
13 notorious route for alien smugglers, defendant was traveling alone and did not acknowledge
14 the agents as he passed their marked car, vehicle was a kind agents thought could be used for
15 alien smuggling, while being followed, defendant looked at the agents several times in his
16 rear view mirror and swerved slightly within his lane, vehicle appeared to be heavily loaded,
17 driver was Hispanic); *United States. v. Hernandez-Alvarado*, 891 F.2d 1414 (9th Cir. 1989)
18 (nervous demeanor of driver and passengers, reduction in speed, presence of a two-way
19 antenna, residence in a neighborhood on the U.S.-Mexican border which was under
20 investigation for narcotics activity, car purchased from a dealership associated with drug
21 trafficking and the size of defendant's trunk were insufficient to justify investigatory stop).
22 Accordingly, the Magistrate recommends that Defendant Mikels' motion be granted.

23

24                                      **RECOMMENDATION**

25       In view of the foregoing, it is recommended that, after its independent review of the
26 record, the District Court GRANT Defendant's Motion to Suppress filed on August 4, 2010.
27 (Doc. 11.) The parties have **fourteen (14) days** to serve and file written objections to the
28

Report and Recommendation.  The parties are advised that any objections should be filed with the following caption: **CR 10-1589-TUC-FRZ.**

DATED this 3rd day of November, 2010.

Jennifer C. Guerin
United States Magistrate Judge